LOUISE T. HAMMOND, APPELLANT AND CROSS-APPELLEE, V.
NEBRASKA NATURAL GAS COMPANY, ET AL., WALSH, WALENTINE & MILES, APPELLEE AND CROSS-APPELLANT.

309 N.W.2d 75

Filed August 7, 1981. No. 43408.

William G. Line and John F. Kerrigan of Kerrigan, Line & Martin for appellant.

Richard E. O'Toole and Thomas J. Walsh of Walsh, Walentine, Miles, Fullenkamp & O'Toole for appellees Cornhusker, New Hampshire Ins. Co., and Walsh, Walentine.

Ronald H. Stave and Thomas J. Shomaker of Sodoro, Johnson, Daly, Stave, Cavel & Coffey for appellee St. Paul Fire.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

PER CURIAM.

This action is the second appeal of the above-captioned case to this court. The general background of the litigation is set out in our opinion in *Hammond v. The Nebraska Nat. Gas Co.*, 204 Neb. 80, 281 N.W.2d 520 (1979), and will not be repeated here, except as is pertinent in part with the issues in this appeal.

It appears from the record that after the entry of the judgment in the original action, the law firm of Walsh, Walentine & Miles of Omaha, Nebraska, filed attorney liens pursuant to the provisions of Neb. Rev. Stat. § 7-108 (Reissue 1977) against the proceeds of the judgment recovered by Louise Hammond, the plaintiff in the original case, in the amount of $427,500 and, in addition, interest thereon. Thereafter, on August 21,

1979, Walsh, Walentine & Miles filed in the original action what they captioned "Motion for Determination of Validity and Amount of Attorneys' Liens and Distribution of Judgment as Interests Appear."

On the following day, August 22, 1979, the law firm filed an "application," asking the court for a determination of the respective amounts of the various interests in the judgment and for an allocation of attorney fees from the amount of the personal interest of Louise T. Hammond and the amounts of the subrogated interest of Fireman's Fund Insurance Company and St. Paul Fire & Marine Insurance Company, plus a proration of reasonable sums expended for discovery, trial, and appeal of the captioned suit. On August 27, 1979, the plaintiff filed what it titled "Response Of Plaintiff To Motion With Respect To Attorneys' Liens And Distribution Of Judgment, And Application Supplementary Thereto." In that response plaintiff denied that the Walsh law firm had been employed to represent her; prayed that all the claims of Walsh be dismissed, or, in the alternative, that out of the proceeds of the judgment in the hands of the court, the court authorize the payment of court costs to the parties who had paid those costs and who were entitled to reimbursement; prayed for the repayment to the Cornhusker Casualty Insurance Company, the New Hampshire Insurance Company, the Fireman's Fund Insurance Company, and the St. Paul Fire & Marine Insurance Company of monies paid to her after the entry of the judgment under the terms of their respective insurance policies in amounts totaling $307,400, which sums had been paid to her under loan receipts from each of said companies, about which more will be said later in this opinion; and also prayed that all the balance of the avails of the judgment, including interest accrued and accruing, be paid to her.

This matter came on for hearing before the District Court of Dodge County on September 13, 1979, for a determination of the respective amounts and various

interests in the judgment rendered; the allocation of attorney fees; the allocation of all postjudgment interest; the division of the amount of postjudgment interest owing Louise T. Hammond; and the right, if any, of Walsh, Walentine & Miles to an attorney fee from Louise T. Hammond, the Fireman's Fund Insurance Company, and the St. Paul Fire & Marine Insurance Company.

In its order entered on April 9, 1980, the District Court found as follows:

"That on or about January the 10th, 1976, the Plaintiff, Louise T. Hammond, was the owner in fee of the Pathfinder Hotel in Fremont, Nebraska. That on January 10th, 1976, there were four insurance policies in full force and effect by four different insurance companies as hereinbefore set forth.

"That on or about February 4th, 1976, the New Hampshire Insurance Company paid Mrs. Hammond the face amount of its policy in the sum of $125,000.00, taking a loan receipt from the Plaintiff. That on or about the 4th day of February, 1976, the Cornhusker Casualty Insurance Company paid the Plaintiff the sum of $125,000.00, taking a like loan receipt from the Plaintiff. That on or about March 30, 1976, the Fireman's Fund Insurance Co. paid the Plaintiff the sum of $50,000.00, procuring a loan receipt from the Plaintiff. That the St. Paul Fire & Marine Insurance Company paid the Plaintiff the sum of $7,400.00, taking a like loan receipt from the Plaintiff.

"That immediately subsequent to January 10th, 1976, and at all times material to this matter, the Cornhusker Insurance Company and the New Hampshire Insurance Company were represented by the law firm of Walsh, Walentine and Miles. That the Fireman's Fund Insurance Co. was represented by the Law firm of Niewald, Risjord & Waldeck and the St. Paul Fire & Marine Insurance Company was represented by the law offices of Emil F. Sodoro, P.C.; and that the Plaintiff

was represented by the law firm of Kerrigan and Line.

. . . .

"There was no attorney-client relationship at any time existing between the law firm of Walsh, Walentine, and Miles with the Plaintiff, Louise T. Hammond, the Fireman's Fund Insurance Co. or the St. Paul Fire and Marine Insurance Company. Those respective parties had, at all times material, retained and were represented by counsel of their choice.

"That the Plaintiff, Louise T. Hammond, by the insurance contract and execution of the loan receipts was contractually obligated to cooperate with the four insurance carriers and their retained counsel and the Plaintiff's counsel was also obligated to cooperate as per the provisions of the loan receipts.

"The law firm of Walsh, Walentine & Miles represented their companies['] interest totaling $250,000.00 of the total $307,400.00 insurance proceeds and in the main they proceeded to prepare and present the case, be the chief counsel in the trial court, and in the main handle the subsequent appeal to the Supreme Court. As to the Plaintiff, Louise T. Hammond, they acted by reason of a contractual right with the Plaintiff under her insurance policy and by mutual agreement between the attorneys for the other two insurance carriers.

"The record is bare of any indication of non-cooperation by any of the other parties before the Court and received into evidence are numerous affidavits of attorneys of record and other persons involved directly or indirectly in the preparation and trial of the lawsuit. Giving equal credence to all the affidavits, they are hopelessly impossible of resolve. The law firm of Walsh, Walentine, & Miles prosecuted their claim upon attorney liens against the various interests of the other parties and in support thereof advanced an equitable theory of Common Fund or Quantum Meruit.

"The Court, addressing itself to the matter of the attorney liens filed by the law firm of Walsh, Walentine, & Miles, finds that no valid liens exist. Section 7-108,

R.R.S. Neb., 1943, authorizes attorney liens and the basis for the same i.e. an attorney-client relationship must exist, either express or implied. No such relationship existed, either express or implied, in the above entitled cause and therefore, there is no basis to give rise to a statutory attorney lien as authorized by Section 7-108.

"The Court, addressing itself to the applicants' theory of Common Fund or Quantum Meruit, the law firm of Walsh, Walentine, & Miles performed pursuant to a contract of employment with their employers, the Cornhusker Casualty Insurance Company and the New Hampchire [sic] Insurance Company. Professionally, they were obligated to do so. The Plaintiff, Louise T. Hammond, was contractually obligated to cooperate and so her attorneys were also obligated for they stood in no different stead than the Plaintiff. As between the counsel for the other insurance carriers, since the firm of Walsh, Walentine, & Miles had by far the greatest financial interest in the outcome of the law suit; the evidence establishes it is customary in the trade for the firm with the greatest interest to be the lead counsel. In this case, the record is repleat [sic] that is the position the Walsh Firm not only chose, but insisted upon assuming. This case is simply not a Common Fund proposition and the facts clearly distinquish the case before the bar from United Service[s] Automobile Association v. Hills, 172 Neb. 128, and other Nebraska cases which are addressed to the Common Fund doctrine."

The District Court also determined that the costs of the original litigation, as exhibited by exhibit C, amounted to $23,513.19. This court awarded costs in the amount of $2,932.22, leaving a net cost remaining of $20,580.97. The District Court allocated costs of the litigation in the percentage the various interests bore to the whole as follows: Cornhusker Casualty, .2924; New Hampshire Insurance, .2924; Fireman's Fund Insurance, .1170; St. Paul Fire & Marine, .0173; and Louise T. Hammond, .2809. The court also allocated the

interest, both awarded and accrued, in the same percentages. The costs of the action were taxed to the Walsh law firm and subsequent motions for new trial filed by both the plaintiff and the applicant were subsequently overruled.

In her brief on appeal, the plaintiff assigns as error that the trial court erred in failing to award her all postjudgment interest, and in charging her with a share of the litigation expenses. The law firm of Walsh, Walentine & Miles has cross-appealed to this court, assigning as error the failure of the trial court to allocate an attorney fee from a common fund produced for the benefit of Louise T. Hammond, Fireman's Fund Insurance Company, and St. Paul Fire & Marine Insurance Company. The appellee law firm also alleges error on the part of the trial court in declaring the attorney liens invalid.

The loan receipts supplied by the New Hampshire Insurance Company and the Cornhusker Casualty Insurance Company for the advancement of the funds to the plaintiff are almost identical, and provide in pertinent part: "Received from the New Hampshire Insurance Company (hereinafter referred to as 'Company') the sum of One Hundred Twenty-Five Thousand and no/100- - -Dollars ($---125,000.00---) as a loan, *without interest*, repayable only in the event and to the extent of any net recovery the undersigned may make from any person, persons, corporation or corporations, or other parties, causing or liable for the loss or damage to the property described below, or from any insurance effected on such property, *and as security for such repayment the undersigned hereby pledges to the said 'Company' all his, its or their claim or claims against said person, persons, corporation or corporations or other parties*, or from any insurance carrier or carriers, and any recovery thereon, and hereby delivers to said 'Company' all documents necessary to show his, its or their interest in said property.

"The undersigned covenants that no settlement has

been made by the undersigned with any person, persons, corporation or corporations, or other parties against whom a claim may lie, and no release has been given to anyone responsible for such loss and that no such settlement will be made, nor release given without the written consent of the said Company; and *the undersigned covenants and agrees to cooperate fully with the said Company, to promptly present claim and, if necessary, to commence, enter into and prosecute suit against such person or persons,* corporation or corporations, or other parties, through whose negligence or other fault the aforesaid loss was caused, or who may otherwise be responsible therefor, with all due diligence, in his, its or their own name.

"In further consideration of said advance the undersigned hereby guarantee(s) that he, it or they are the owner(s) of said property and entitled to recover upon said claim for loss or damage thereto, and hereby appoint(s) the managers and/or agents of the said 'Company' and their successors severally, his, its or their agent(s) and attorney(s)-in-fact, with irrevocable power, to collect any such claim or claims, and to begin, prosecute, compromise or withdraw in his, its or their name, *but at the expense of the said 'Company,' any and all legal proceedings that the said 'Company' may deem necessary to enforce such claim or claims,* and to execute in the name of the undersigned, any documents that may be necessary to carry the same into effect for the purposes of this agreement.

"Any legal proceedings are to be under the exclusive direction and control of said 'Company.'" (Emphasis supplied.)

A loan receipt provided by Fireman's Fund Insurance Company was signed by the plaintiff on March 30, 1976. The loan agreement form provided by St. Paul Fire & Marine Insurance Company does not appear in the record, but apparently was similar in its terms. We note that the validity of loan receipt agreements between an insured party and his insurer has been approved by this

court. *Shiman Bros. & Co. v. Nebraska National Hotel Co.*, 143 Neb. 404, 9 N.W.2d 807 (1943); *Bozell & Jacobs, Inc. v. Blackstone Terminal Garage, Inc.*, 162 Neb. 47, 75 N.W.2d 366 (1956). In *Shiman Bros.*, this court stated: "An arrangement between an insurer and an insured, whereby the former loaned to the latter the amount of a loss under the terms of a policy of insurance, to be repaid only if the insured made a recovery from a third person, is a lawful agreement and the loan thus made is not such a payment of insurance as to make the *insurer the real party in interest*." (Emphasis supplied.) (Syllabus of the court.)

In the instant case, the plaintiff entered into loan agreements whereby she pledged any and all claims she had against Nebraska Natural Gas Company to her insurers as security for the repayment of the "loans" in accordance with the terms of the loan agreement, in the total amount of $307,400. The loan receipts expressly provided that the plaintiff would not enter into any settlement with anyone responsible for her loss; that she would cooperate fully with her insurers in prosecuting the claim; that all legal proceedings were to be under the exclusive direction and control of her insurers; and that said legal proceedings would be at the expense of the insurers.

In disposing of this case, it is obviously necessary to interpret the language contained in the loan agreements executed by the plaintiff. In *Wyatt v. Woodmen Acc. & Life Co.*, 194 Neb. 614, 616-18, 234 N.W.2d 217, 219-20 (1975), this court stated as follows: "A policy of insurance will be given effect according to the ordinary sense of the terms used, and if they are clear they will be applied according to their plain and ordinary meaning. . . .

. . . .

"An insurance policy should be construed as any other contract to give effect to the intent of the parties at the time it was made. The language should be considered not in accordance with what the insurer intended it to

mean but what a reasonable person in the position of the insured would have understood it to mean. In giving effect to this principle of law, it is imperative that the contract made by the parties shall be respected and that a new contract is not interpolated by construction." See, also, *Steinheider & Sons, Inc. v. Iowa Kemper Ins. Co.*, 204 Neb. 156, 281 N.W.2d 539 (1979).

It appears to us that the language of the loan receipts is clear and unambiguous. By the terms of the loan receipts the insurers obligated themselves to bear the expense of all legal proceedings pursued in prosecuting the claims of the plaintiff, which she pledged to the insurance companies. We determine that the order of the District Court must be modified in part as to that portion of the order charging her with a percentage of the litigation expenses, as set out above in the order of the court.

We do not agree, however, with the plaintiff's contention that she is entitled to all postjudgment interest in the judgment recovered by her in the amount of $427,500, which amount is approximately $120,000 more than the amount loaned to her by the insurance companies. For clarification, we note that the insurance companies do not claim interest on the money they loaned to plaintiff in March of 1976 under the loan receipts; rather, the companies claim the right to postjudgment interest on the sum of $307,400 included in the original judgment.

While Nebraska apparently has not ever specifically passed upon this question, we are persuaded by the opinion of the court in *Herbert Rosenthal J. Corp. v. St. Paul F. & M. Ins. Co.*, 21 App. Div. 2d 160, 249 N.Y.S.2d 208 (1964), in which case the Supreme Court, Appellate Division, held that an insurer which recovered, on insured's behalf in a negligence action against a third person, the amount the insurer had paid the insured plus loss of profit was entitled to interest awarded on the amount paid to insured, even though the loan receipt stated that the loan was without interest,

where the receipt was the means of making absolute payment of the loss and of permitting the insurer to sue in insured's name. With respect to the question of who was entitled to the interest on the judgment, the court stated: "On this analysis there is no valid ground, other than a forced application of what are at best ambiguous words, why the insurer should not receive the interest accrued on the money of which it had been deprived, and not the insured which has had its money all this time. . . . This is not interest paid directly or indirectly by the insured ('the borrower') which is all that is forbidden by the loan receipt, but it is paid by the third party with which, as to this portion of the recovery, the insured has long ago ceased to have concern and privity." *Id.* at 166, 249 N.Y.S.2d at 214.

In the instant case, the plaintiff has had the benefit of the $307,400 since the date it was paid to her by the respective insurance companies in 1976. We determine that the trial court properly divided the interest, both awarded and accrued, in proportionate shares according to the percentage the parties' interest bears to the whole.

We now turn to the assignments of error raised by the law firm of Walsh, Walentine & Miles on cross-appeal. We determine, initially, that the trial court was correct in ruling that no proper attorney lien existed under § 7-108. That section specifically provides: "An attorney has a lien for a general balance of compensation upon any papers *of his client* which have come into his possession *in the course of his professional employment*; and upon money in his hands *belonging to his client,* and in the hands of the adverse party in an action or proceeding in which the attorney was employed from the time of giving notice of the lien to that party." (Emphasis supplied.)

At no time in the instant case did an attorney-client relationship exist between the law firm of Walsh, Walentine & Miles and the plaintiff, the Fireman's Fund Insurance Company, or the St. Paul Fire &

Marine Insurance Company. Those parties were, at all times pertinent to the litigation, represented by the counsel of their choice. Therefore, the attorney liens filed by the applicant under § 7-108 are invalid, and the trial court properly ruled as such.

We now consider what is probably the principal issue involved in the cross-appeal of Walsh, Walentine & Miles. The firm contends that the trial court erred in failing to allocate a fee to the Walsh firm from a "common fund" produced for the benefit of Louise T. Hammond, Fireman's Fund Insurance Company, and St. Paul Fire & Marine Insurance Company. Walsh contends that he is entitled to such fee because of the fact that he and his firm did most of the work, trial and preparatory, with reference to the original litigation, as a result of which a judgment was recovered greatly in excess of that which was actually anticipated, and which enured to the benefit of both the plaintiff and the insurance companies covering losses resulting from the fire. It is true that the Walsh firm, by virtue of the size of its claim, acted as "lead counsel" in the litigation, and also represented its own clients, New Hampshire Insurance Company and Cornhusker Casualty Insurance Company. Walsh describes the contributions of counsel for the other insurance companies and parties to the litigation as being minimal or nonexistent. However, the record reveals that he assumed his position as "lead counsel" at his insistence; and it is not true, as revealed by the record, that the other counsel made minimal or no contributions. In fact, it appears that part of the reason for the failure of the other counsel to partake more actively in the preparation and trial of the lawsuit was due to Walsh's request and insistence. At the hearing with regard to attorney fees, John Risjord, counsel for Fireman's Fund Insurance Company, testified, and was examined by a member of his own firm. His testimony is enlightening, and we set it out in some detail:

"Q- Did you, in any of your telephone conversations

with Mr. Walsh, have occasion to discuss with him how attorney fees would be paid if settlement or judgment were obtained against any of the Defendants? A- Yes, sir. Q- Do you know when that conversation took place? A- Yes, sir. Q- When was that? A- March 9, 1976. Q- And how are you so sure of that date, sir? A- I have a telephone record of it. As a matter of fact, I have our original telephone office record here. Q- Those records reveal that you talked with the number which corresponds with the telephone number of the Walsh Firm in Omaha on March 9, 1976? A- Correct. I had previously taked [sic] with him on the telephone on the subject of the March 9th, conversation and Mr. Kerrigan had written a letter a little earlier, a few days earlier anyway, suggesting a proration of the recovery. Which Mr. Walsh was not very happy with because the net effect of it might be to diminish Mr. Walsh's fees. I advised Mr. Walsh early in the game that I didn't know how much gas explosion experience he had, and I still don't know, and I advised him that I had tried 12 or 14 of these cases, including plastice [sic] pipe and coupling cases, to whatever benefit that could be to him. That I would be glad to help out and try to guide the litigation and he thanked me for that and indicated that he was perfectly capable of handling it himself. I'm sure he was. So, we didn't undertake to further advise him much as to how to handle the case. He advised me, in a letter I think, that he would also send me copies of letters to Kerrigan and rather insisted upon taking the lead in the case. He felt he had his client's lion share of the money involved in the case, to some extent a quarter of a million dollars on the building and we only had $50,000.00 on the contents. Q- What previoulsy [sic] was the nature of the conversation on March 19th, with relation to attorney fees? A- Mr. Walsh expressed concern that the filing of the suit was emminent [sic]. He had not yet paid the Hammonds' apparently, but he had the check ready to pay them. We had paid the Hammonds' their total policy. He prepared a preliminary

petition and sent me a copy of it for critique. I critiqued it and suggested some things that he might change and alter in it, including the fact he didn't have the coupler manufacturer properly identified or pleaded and I found out who that was from Mr. White and furnished the name and this sort of thing. Following that he redrafted it and sent it to me and we discussed it before it was filed and discussed it with Mr. Kerrigan. That was one of the things I called about and he raised the issue of attorney fees. In view of Mr. Kerrigan's letter, in which it was at least implied, that Mr. Walsh or I might not enjoy the attorney fee arrangement we had with our clients, *it was Mr. Walsh's suggestion, in fact he insisted, that each of us should look to our own clients for our fees.* He was particularly adamant about that and Mr. Kerrigan was not going to share his fee. I agreed that would be agreeable with me. He advised me in that conversation that he had discussed it with Mr. Kerrigan and he thought Mr. Kerrigan would go along with that. So, we entered into the three way situation somewhat awkwardly, but on the basis each of the three firms would undertake to collect whatever fee arrangement they had with their own clients and no attorney involved would share in anybody elses' [sic] fee. Q- Did Mr. Walsh express to you concern that the ultimate judgment which might be obtained might be less than the total insurance on the building? A- Yes. Q- Did he indicate that was his concern about it that the fees than a whole pie a whole pie there to be divided up? A- That's correct. He was particularly concerned about that with respect to the value of the building. The building had been purchased for substantially less than a quarter of million. However, I felt the liability of the gas company being evidence that the jury would undoubtedly award whatever, substantially whatever, value was proved on the building. I didn't have the concern he did. I wasn't representing the building carrier and I felt we had a pretty solid contents cliam [sic] for the furnishings and equipment for $50,000.00. Q- After the review of the

petition, and the amendments made pursuant to your suggests [sic] and the case was filed, did you, thereafter, offer the services of Mr. White and the services of your law firm to Mr. Walsh to pursue this litigation? A- On a number of occasions. Q- What response, if any, did you get to these offers? A- Well, he made it clear it was his parade and I truly didn't want to rain on it either. It is traditional in insurance subrogation where you have two companies on the same risk that the one that has the lion's share, that company and their lawyer run the show. I was perfectly willing that be so. As we went along, there was very little discovery for a number of months. The parties were filing motions and the gas company was filing motions and parties being added and subtracted and primarily consolidated for discovery with other cases and this sort of thing. Both Mr. Kerrigan and Mr. Walsh were primarily on top of it. Q- Did your firm take part in the actual trial which commenced in January of 1978? A- Well, yes and no. We got news, I think through Mr. Kerrigan, that the Walsh Firm was trying to get one of their smaller cases they were involved in to trial as a test case. I was concerned about that because I didn't think the case they chose had too much impact. It was property damage and subrogation without much appeal. I felt one of the stronger cases might be better litigated. I hadn't been consulted in the matter so I volunteered to Mr. Walsh's Firm. I first talked to Mr. O'Toole and told him we would be of whatever assistance we could be in that case. Q- Was that the Opera Company case? . . . Q- Have you reviewed the time record of the firm to determine the total number of days or percentage actual trial days which our firm was represented here in the courthouse? A- Not percentage wise. I know that you attended the trial on reportedly at least all but, I think, on parts of one or two days. I was rather distressed when you reported to me after you arrived here that Mr. Walsh had had you excluded from the counsel table in view of the fact we were representing an inter-

est in the subrogation in the action with a substantial financial interest. Q- In your years of practice, have you ever seen that type of procedure invoked before? A- Never." (Emphasis supplied.)

The record also reveals that the other firms involved in said litigation contributed in varying amounts and degrees to the preparation and trial of the lawsuit. The attorneys for the plaintiff herein, Kerrigan and Line, were, as revealed by the record, responsible in no small part for obtaining the evidence with reference to the damages involved in the fire of the Pathfinder Hotel and were able to do so after the Walsh firm was unable to obtain evidence justifying an increase in the verdict, redounding to the benefit of the plaintiff. Also the Sodoro firm, attorneys for St. Paul Fire & Marine Insurance Company, attended 29 depositions in preparation for the trial. We also point out that while there is not in evidence records of the time spent by the other firms for their own clients in connection with the case, as was true in the case of the Walsh firm, we believe that the value of the respective contributions of counsel in a multicounsel case cannot be determined solely on the basis of the time devoted to the case. The skill, advice, and experience of other counsel who may assist or advise, and participate to some degree, in recovering a favorable verdict in a complex suit must also be considered. We believe it would be an almost impossible task for this court to review, evaluate, and apportion the contributions of the respective counsel in situations such as this and attempt to award to the various counsel participating in a lawsuit part of the fees individually contracted for by them with their own clients. Had there been a specific agreement between said counsel at the inception of the litigation, and their respective contributions and duties delineated, it probably would have diminished or eliminated the possibility of situations occurring such as the one with which we are confronted. We might also add that if any or all of the other interested counsel were not carrying out their appointed

tasks during the course of the litigation, complaint to that effect could and should have been made before judgment was obtained, and not after the recovery of judgment in an effort to augment the attorney fees for counsel under the claim that it had made the greatest contribution to the success of the litigation.

In support of its position that it is entitled to part of the fee of other counsel in the litigation, the Walsh firm relies strongly upon two prior Nebraska cases, to wit, *United Services Automobile Assn. v. Hills*, 172 Neb. 128, 109 N.W.2d 174 (1961), and *Krause v. State Farm Mut. Auto. Ins. Co.*, 184 Neb. 588, 169 N.W.2d 601 (1969), which cases establish the "common fund" rule in this jurisdiction. In *United Services Automobile Assn. v. Hills*, *supra*, the court stated at 133, 109 N.W.2d at 177: "The applicable rule is that where the holder of the subrogation right does not come into the action, whether he refuses to do so or acquiesces in the plaintiff's action, but accepts the avails of the litigation, he should be subjected to his proportionate share of the expenses thereof, including attorney's fees." In the *Hills* case, the attorney was awarded an attorney fee from a recovery made as the result of his efforts, where the insurance company, although originally a party to the action, withdrew from the suit and refused to participate in the recovery. The court, under those circumstances, refused to permit the unjust enrichment of the insurance carrier and awarded Hills an attorney fee for representing the interest of United Services Automobile Association in recovering the "common fund." In the opinion the court states at 134, 109 N.W.2d at 178:

"United contends, however, that the foregoing rule does not apply where the insured is informed that its subrogation claim is not to be included in the litigation and it indicates an intention to pursue the enforcement of its right of subrogation in some other manner. It seems clear to us, however, that whatever intentions United may have had prior to the commencement of the present action, they were abandoned when it elected

to pursue its general equitable right of subrogation against the avails of the settlement established by the efforts of the Dawsons and Hills. In other words, when United abandoned its previous hostile position and elected to seek the collection of its claim from the avails of the litigation and settlement secured solely by the efforts of the Dawsons and Hills, it brought itself squarely within the cited authorities. Under such situation, justice and equity require that United pay its proportionate share of the expenses, including attorney's fees, incurred by the Dawsons and Hills in establishing the fund from which United seeks to benefit."

We believe that the *Hills* case is factually distinguishable from the instant case in several respects. In *Hills*, the insurance company was not a party to the litigation nor was it represented by counsel. In the instant case the plaintiff and the four insurance companies, two not being represented by the Walsh firm, were actual parties to the litigation and were each represented by attorneys employed by them. While it is true, as discussed above, that the amounts of the respective contributions of the attorneys varied greatly, the fact remains that they were still representing their clients in the litigation and participated, to some extent at least, in the conduct of the case. We are impressed by the language of the court in *Wash. Fire & Marine Ins. Co. v. Hammett*, 237 Ark. 954, 377 S.W.2d 811 (1964), where the court stated at 956, 377 S.W.2d at 813: "The appellant's real grievance lies in having to pay a fee to an attorney not of its own choice. Subrogation however, is governed by equitable principles. *Webster v. Horton*, 188 Ark. 610, 67 S.W.2d 200. *If the appellant had employed its own attorney and had actively participated in the action against Purcell it could not fairly have been compelled to contribute to Howard's fee. Pontiac Mutual County, Etc. Co. v. Sheibley, 279 Ill. 118, 116 N.E. 644. But when the insurance company has benefited from the work done by the insured's attorney there is no inequity in*

*requiring it to bear its fair share of the collection expense."* (Emphasis supplied.)

Likewise, in *Travelers Ins. Co. v. Williams*, 541 S.W.2d 587, 589-90 (Tenn. 1976), the court was confronted with a similar situation and stated: "There are, of course, many situations in which the work of an attorney proves useful to persons other than his own client. The normal rule in such cases is that he must look only to his client, with whom he has contracted, for his compensation, notwithstanding the acceptance of benefits by others. [Citations omitted.] But, an exception to this rule is made whenever one person, having assumed the risks and expense of litigation, has succeeded in securing, augmenting, or preserving property or a fund of money in which other people are entitled to share in common. In that event, the expenses of the action are borne by each participant according to his interest. [Citations omitted.] The fairest and most efficient means of distributing these costs is thought to be to make them a charge upon the fund itself. This device, known as the 'fund doctrine,' was invented by courts of equity to prevent passive beneficiaries of the fund from being unjustly enriched. It is, therefore, never applied against persons who have employed counsel on their own account to represent their interests. [Citations omitted.] Thus, the right to employ counsel of one's own choosing is preserved." In its opinion the court also stated: "Neither do we find evidence of unjust enrichment of the insurer from the services of the insured's attorney upon which a quasi or constructive contractual duty could be based. In our view, one is not unjustly enriched by a benefit 'forced upon' him as the result of services voluntarily and officiously performed by another who has been expressly informed by the alleged promisor that his services are not desired.

"We conclude that the facts of this case do not entitle the insured's attorney to receive any fee from the insurer with respect to the subrogation claim; he acted as

a volunteer." *Id.* at 590-91. In this connection see, also, *Pontiac Fire Ins. Co. v. Sheibley,* 279 Ill. 118, 116 N.E. 644 (1917).

The Walsh firm also cites and relies upon the cases of *Gillotte v. Omaha Public Power Dist.,* 189 Neb. 444, 203 N.W.2d 163 (1973), and *Schulz v. General Wholesale Coop. Co., Inc.,* 195 Neb. 410, 238 N.W.2d 463 (1976), in support of its contention that it is entitled to share in the attorney fees of the other attorneys in the cause because of work performed. We point out, however, that both of the above-cited cases were workmen's compensation cases and involved an interpretation of Neb. Rev. Stat. § 48-118 (Reissue 1978), which specifically provides that where an employer and employee join in a suit against a third person, the District Court has jurisdiction to determine all disputes between the employer and employee, including the setting and allocation of attorney fees and expenses. There is no similar specific provision applicable to the facts of the situation involved in this case. Moreover, we point out that even in *Schulz, supra,* the court went on to state at 416-17, 238 N.W.2d at 467-68: "At no time did St. Paul's counsel terminate or abandon its representation or rely on or acquiesce in representation of their client by Cobb. Their representation of St. Paul remained active and viable throughout, culminating in their participation in the District Court hearing to approve the final lump sum settlement.

"Under these circumstances, we conclude that St. Paul had full and adequate representation from its own counsel and we affirm the District Court's denial of plaintiff's application for attorney's fees."

Our conclusion is that the "common fund" doctrine is not applicable under the facts of the instant case, and that the Walsh firm is not entitled to augment its contracted fees entered into with its clients, but that the respective counsel in the instant case, with respect to attorney fees for their participation in the litigation, are relegated to their contracts with their respective clients.

In view of what we have stated above, the order entered by the District Court, as modified, must be and hereby is affirmed.

AFFIRMED AS MODIFIED.